SIMPSON v. SIMPSON

[149 N.C. App. 440 (2002)]

———————

TOMMY L. SIMPSON, Plaintiff v. ROSEMARY RUFFO SIMPSON, A/K/A ROSEMARY LITKA, Defendant

No. COA01-603

(Filed 19 March 2002)

**Child Support, Custody, and Visitation— custody—modification—substantial change in circumstances of parent's lifestyle**

The trial court did not err in a child custody case by modifying the order and awarding custody of the minor child to defendant mother based on a substantial change of circumstances in defendant's lifestyle, because: (1) the trial court's modification order does not rely solely on defendant's success in overcoming her drug dependency, but viewed her drug-free state as the catapult for a wide array of changes in defendant's life; and (2) the trial court's findings reflect that defendant's life significantly changed when she overcame her drug dependency and remarried,

defendant paid great attention to her minor child, the minor child developed a close relationship with defendant's husband and the child's half brother, and a doctor testified that placement with defendant would be relatively better for the child's growth and well-being.

Appeal by plaintiff from order filed 20 October 2000 by Judge Nathan Hunt Gwyn, III in Stanly County District Court. Heard in the Court of Appeals 19 February 2002.

*Helms, Henderson & Porter, P.A., by Christian R. Troy, for plaintiff-appellant.*

*Currie Law Office, by Lisa W. Currie, for defendant-appellee.*

GREENE, Judge.

Tommy L. Simpson (Plaintiff) appeals a custody modification order filed 20 October 2000 awarding custody of his daughter Shelby Lynn Simpson (Shelby) to her mother, Rosemary Ruffo Simpson a/k/a Rosemary Litka (Defendant).

On 25 January 1996, the parties, who had been married since 25 January 1992, were granted a divorce and Plaintiff was awarded custody of their two-year-old daughter Shelby. An order dated 25 January 1996 provided that Defendant is "neither an unfit parent nor is she a bad person" and determined that Plaintiff and Defendant "shall have shared parental responsibility of [Shelby]." The trial court further ordered that Defendant would be allowed visitation "only if [she] undert[ook] monthly drug screening tests for 'all drugs.' "

On 12 August 1999, Defendant filed a motion for an immediate *ex parte* custody order and for a change of custody based on a substantial change of circumstances in her lifestyle. The matter was reviewed by the trial court on 19 August 1999. The trial court ordered that Shelby be placed in the temporary custody of her paternal grandmother and that Plaintiff submit to a psychological evaluation. Upon completion of the psychological evaluation, Defendant's motion to modify custody was tried on 25 and 26 September 2000. In a custody modification order filed 20 October 2000, the trial court found in pertinent part that:

10. [A]t the time [the initial] custody order awarded primary custody [of Shelby] to Plaintiff, [the trial court] perceived and contemplated that Defendant suffered from a dependency upon

**SIMPSON v. SIMPSON**

[149 N.C. App. 440 (2002)]

illegal drugs[] and accordingly made Defendant's visitation rights contingent upon refraining from the use of all drugs.

11. [F]rom the testimony presented, Defendant has refrained from the use of all drugs for at least five (5) years prior to seeking a modification of custody, and that as a result[,] the quality of Defendant's life and those around her has improved significantly.

12. Defendant re[]married on September 14, 1996; . . . her husband, Rick Litka[,] is a person she has known for fifteen (15) years previously; . . . together Defendant and her husband have a three[-]year[-]old son, "Kolby."

13. [N]ow drug[-]free, re[]married, and the mother of a second child, Defendant has re[]connected with her parents and the other members of her family, visiting in her parents['] home one to three times a week.

14. Defendant and her husband now live in a two-bedroom home with a carport, living room, kitchen, and yard for children to play in. Their home is within walking distance of nearby schools . . . . Defendant and her husband . . . are current on their rent.

15. Defendant presently enjoys a stable work history . . . . Defendant earns $9.00 an hour[] and has held this same job for several years.

. . . .

17. [W]hile Defendant had visitation with [Shelby] from May 27, 2000 till July 29, 2000, Defendant and her husband established a daily routine for Shelby that consisted of her brushing her teeth and hair in the morning, spending time with her maternal grandparents, setting the dinner table, eating together as a family, doing the dishes, playing outdoors, bathing afterwards, watching television, saying her prayers, [and] then going to bed. While with Defendant and Defendant's husband over the summer, Shelby was made to follow rules of the house.

18. Shelby grew attached to her three[-]year[-]old [half] brother Kolby over her summer's visitation . . . .

19. Defendant's neighborhood offers Shelby an opportunity of playing and interacting with other children her age.

20. [W]hile with Defendant, Defendant's husband and Shelby developed a close relationship.

21. [W]hile with Defendant, Shelby was included in a number of family activities, including coloring, bicycling and playing on swings together.

22. Defendant and her husband . . . included Shelby in church activities . . . this past summer.

23. [B]y virtue of her re[]marrying, Defendant now has the benefit of having another adult in the home to help in the running of the house and the raising of a family, whereas before she was by herself.

24. [F]rom the testimony presented, Defendant is now more self-reliant and more financially responsible than before . . . .

25. Defendant has invested in and involved herself in community and neighborhood activities.

26. Defendant keeps and makes available to her children a variety of educational materials in her home. While her child visited with her over the summer, Defendant read to Shelby from these educational materials often.

. . . .

28. [W]hen [Shelby] arrived . . . for her visitation with Defendant this past summer, Shelby was clothed in "toddler[-]sized" clothes despite being seven (7) years of age; also . . . when she arrived she did not yet know how to wipe herself after using the bathroom in a manner appropriate for young girls so as to not have her underwear soiled.

29. [A]t the hearing of this action[,] Defendant called as a witness Dr. Jonathan Gould, Ph.D. [(Dr. Gould)], a child psychologist and certified custody evaluator. . . . [T]he [trial] court received Dr. Gould without objection by . . . Plaintiff as an expert in the field of forensic and clinical psychology. . . . Dr. Gould testified and the Court finds . . . as follows:

> a. Dr. Gould interviewed Defendant in October 1990 [sic] for a total of five hours. . . . [D]uring his interview of Defendant[,] he observed the interactions of Defendant and her daughter Shelby through a one-way mirror unbeknownst to Defendant and [Shelby]. . . . [A]s he did so, Dr. Gould observed "a high level of energy" between Defendant and Shelby, a playfulness, ease, and flexibility that were impressive to Dr. Gould. . . . Dr.

Gould conducted a similar observation of Plaintiff and Shelby[] and did not note the high degree of interaction between Plaintiff and Shelby as he did between Defendant and Shelby. . . . [I]nstead Plaintiff appeared tired, and Shelby played by herself rather than with her father.

b. [A]ccording to the most recent IQ testing of Plaintiff, [he] has an IQ of 78, which shows borderline intellectual functioning according to Dr. Gould. . . . [T]his level of intellectual functioning adversely impacts Plaintiff's abilities as a parent in terms of his "planfulness[,]" being able to anticipate, and being able to provide educational opportunities for Shelby to grow beyond his own level of intellectual functioning, according to Dr. Gould.

c. [Shelby] has experienced some difficulties in progressing past kindergarten. . . . [S]he has in the past been prescribed Ritalin while in school. . . . Dr. Gould recommended a Pediatric Neurologist be consulted to determine whether Shelby suffers from Attention Deficit Disorder[] or is simply showing symptoms of the underlying stresses of separation and divorce conflict.

d. [B]ased on his findings, Dr. Gould could not and did not offer an opinion as to which parent, Plaintiff or Defendant, would be "absolutely best" for Shelby to live with. Dr. Gould did[,] however[,] testify that based on the relative emotional, social and intellectual functioning of the parties[] and the quality of interaction between parents, that placement with Defendant would be "relatively" better for Shelby's growth and well-being.

The trial court then concluded that:

4. [T]here have been substantial changes of circumstances in the life of Defendant since custody was first litigated, in that Defendant has become drug[-]free for over five years, has remarried, has had a second child, has re[]connected herself to her family and community, and now has a stable home and work life.

5. [T]hese changes . . . benefit [Shelby's] well-being emotionally, physically, intellectually and medically, as well as in other ways.

As a result, the trial court modified the original custody order by awarding custody of Shelby to Defendant.

---

The issue is whether the trial court's findings support the conclusion that Defendant's changed lifestyle constitutes a substantial change in circumstances benefitting Shelby, thus warranting a modification of the original custody order.

An order pertaining to the custody of a minor child is not a final determination of the rights of the parties as to custody. *See Teague v. Teague*, 272 N.C. 134, 137, 157 S.E.2d 649, 651 (1967). When a substantial change in circumstances affecting the best interest of the child is properly established, the order may be modified. *Pulliam v. Smith*, 348 N.C. 616, 618-19, 501 S.E.2d 898, 899 (1998). "[B]oth changed circumstances which will have salutary effects upon the child and those which will have adverse effects upon the child" must be considered. *Id.* at 619, 501 S.E.2d at 899. Thus, the reformed lifestyle of a parent who was not originally awarded custody of the child can form the basis of a modification of custody. *Metz v. Metz*, 138 N.C. App. 538, 540, 530 S.E.2d 79, 81 (2000).

Plaintiff first asserts the trial court erred in relying on Defendant's success in overcoming her drug dependency as this was a requirement to visitation in the initial custody order and therefore could not constitute a change in circumstances for purposes of custody modification. The trial court's custody modification order does not rely solely on this issue. More accurately, the trial court viewed Defendant's drug-free state as the catapult for a wide array of changes in Defendant's life. Thus, we reject Plaintiff's argument.

Plaintiff next contends the trial court's findings are insufficient to support the conclusion that the changes in Defendant's lifestyle are beneficial to Shelby. *See Best v. Best*, 81 N.C. App. 337, 343, 344 S.E.2d 363, 367 (1986) (findings of fact must support conclusions of law in modification of custody decree). We disagree.

As the trial court's findings reflect, Defendant's life changed significantly when she overcame her drug dependency and remarried: she became very focused on her family and even had another child; she found stable employment; and she attended church regularly. When Shelby came to visit in the summer, Defendant paid great attention to Shelby's needs, involving her in family activities and helping Shelby with her schooling. As a result, there is a "high level of energy" between Defendant and Shelby that does not exist

between Plaintiff and Shelby, as noted by Dr. Gould. Shelby also developed a close relationship with Defendant's husband and her half brother Kolby.

In contrast, while in the care of Plaintiff, seven-year-old Shelby was still wearing toddler-sized clothes and had not yet learned proper hygiene in that she did not know how to properly wipe herself when using the bathroom. Furthermore, Plaintiff had placed Shelby on Ritalin without first having Shelby tested for attention deficit disorder. Finally, Dr. Gould testified "that based on the relative emotional, social and intellectual functioning of the parties[] and the quality of interaction between the parents . . . placement with Defendant would be 'relatively' better for Shelby's growth and well-being." These findings were sufficient to justify the trial court's conclusion that a substantial change in circumstances had occurred in Defendant's life which served to benefit Shelby "emotionally, physically, intellectually and medically." Accordingly, the trial court committed no error.

Affirmed.

Judges McGEE and THOMAS concur.